UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JOSHUA GAINOUS,

    Plaintiff,

-against-

COMMISSIONER OF SOCIAL SECURITY,

    Defendant.

19-CV-10599 (BCM)

**OPINION AND ORDER**

**BARBARA MOSES, United States Magistrate Judge.**

    Plaintiff Joshua Gainous filed this action pursuant to § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final determination of the Commissioner of Social Security (Commissioner) denying his application for Supplemental Security Income (SSI). Now before me are the parties' cross-motions for judgment on the pleadings. For the reasons that follow, plaintiff's motion (Dkt. No. 16) will be granted, the Commissioner's motion (Dkt. No. 18) will be denied, and the case will be remanded for further proceedings.

## Background

    Plaintiff has a long history of mental health impairments and received SSI benefits as a child. *See* Certified Administrative Record (Dkt. No. 14) (hereinafter "R. __") at 130. When he attained age 18 on January 6, 2015, the Commissioner initiated an age 18 redetermination to review his eligibility for continued benefits. (R. 129.)[1] The Social Security Administration found that plaintiff was no longer disabled as of July 27, 2015. (R. 129-30.) On August 11, 2015, plaintiff

---

[1] An individual who receives SSI as a child must, upon attaining age 18, have his or her disability re-determined. 42 U.S.C. § 1382c(a)(3)(H)(iii); 20 C.F.R. § 416.987. The redetermination is governed by 20 C.F.R. § 416.920(c)-(h); that is, by the same multi-step process that applies to new adult disability applications except that the first step – determining whether the applicant engaged in "substantial gainful activity" – is not used for redetermining disability at age 18. *See* 20 C.F.R. § 416.987(b).

requested reconsideration of that determination (R. 142), but on March 11, 2016, after a disability hearing during which plaintiff "wept through most of the interview" and "appeared very depressed" (R. 151), reconsideration was denied. (R. 143, 154-55.)

On April 13, 2016, plaintiff requested a hearing before an administrative law judge (ALJ) (R. 161-64), and on April 11, 2018, plaintiff and a non-attorney representative appeared at a video hearing before ALJ Flor M. Suarez. (R. 58-106.) Board-certified psychiatrist Rita Clark, M.D., appearing as a medical expert (ME), also testified. (R. 97-101.) Dr. Clark opined that plaintiff met the criteria of Listing 12.05 (intellectual disorder).[2] In so concluding, she relied, in part, on the results of a recent consultative examination in which plaintiff was assessed "with a very low IQ – a full scale IQ of 48," thus meeting the criteria of paragraph B(1) of Listing 12.05. (R. 99.) Additionally, Dr. Clark explained, plaintiff "has marked problem[s] in dealing with people because

---

[2] *See* 20 C.F.R. Pt. 404, subpt. P, app'x 1 § 12.05. Listing 12.05 has two paragraphs, designated A and B, either of which will satisfy the Listing. *Id*. To meet the criteria of paragraph B of Listing 12.05, the claimant must have:

1. "Significantly subaverage general intellectual functioning evidenced by" either a "full scale (or comparable) IQ score of 70 or below on an individually administered standardized test of general intelligence" or a score of 71-75 accompanied by a verbal or performance IQ score of 70 or below;
2. "Significant deficits in adaptive functioning currently manifested by extreme limitation of one, or marked limitation of two" of the following areas of mental functioning:
    a. Understand, remember, or apply information;
    b. Interact with others;
    c. Concentrate, persist, or maintain pace;
    d. Adapt or manage oneself; and
3. "The evidence about [the claimant's] current intellectual and adaptive functioning and about the history of [his] disorder demonstrates or supports the conclusion that the disorder began prior to [his] attainment of age 22."

*Id*. § 12.05(B)(1)-(3). *See generally Bushey v. Berryhill*, 739 F. App'x 668, 672 (2d Cir. 2018) (quoting *Talavera v. Astrue*, 697 F.3d 145, 152 (2d Cir. 2012)); *Rivera v. Comm'r of the Soc. Sec. Admin.*, 2020 WL 8167136, at *19-20 (S.D.N.Y. Dec. 30, 2020), *report and recommendation adopted sub nom. Rivera v. Comm'r of Soc. Sec. Admin.*, 2021 WL 134945 (S.D.N.Y. Jan. 14, 2021).

he gets into fights and gets angry a lot of the time and [is] socially isolated and withdrawn and he certainly cannot adapt and manage himself," leading her to conclude that plaintiff had a "marked" limitation "in all criteria" under paragraph B(2) of Listing 12.05. (R. 100-01.)[3] The ALJ thereupon concluded the hearing without calling a vocational expert (VE). (R. 101-02.) However, on July 17, 2018, the ALJ held a supplemental hearing, at which plaintiff again appeared and testified, as did VE Gerald D. Belchick. (R. 1099-1140.)

## The ALJ's Decision

On September 4, 2018, the ALJ issued an unfavorable decision (Decision) (R. 17-27) concluding, again, that plaintiff's disability ended on July 27, 2015. (R. 17.) At step two of the analysis mandated by 20 C.F.R. § 416.920(c)-(h), the ALJ found that plaintiff's learning disability, depression, anxiety disorder, post-traumatic stress disorder (PTSD) and asthma were "severe" impairments. (R. 19.) However, at step three, the ALJ found that none of them, individually or in combination, met or equaled the severity of any Listing. (R. 20-21.) At this step, the ALJ considered Listings 12.04 (depressive disorders), 12.06 (anxiety disorders), 12.11 (neurodevelopmental disorders), and 12.15 (trauma- and stressor-related disorders), but did not expressly discuss Listing 12.05. Nor did she discuss Listing 12.10 (autism spectrum disorders), although plaintiff was diagnosed with autism at age 14 and his special education plan in high school was based in part on that diagnosis. (R. 22, 24, 386-96, 405-09.)

As to the Listings she did discuss, the ALJ found that plaintiff did not satisfy the applicable paragraph B criteria; that is, the requirement that the impairments "result in at least one extreme

---

[3] Since plaintiff was under the age of 22 at the time of the hearing, paragraph B(3) of Listing 12.05 was not in issue.

or two marked limitations" among the four broad areas of functioning assessed. (R. 20.)[4] Specifically, the ALJ found that plaintiff had moderate limitations in understanding, remembering, or applying information (*id.*); mild limitations in interacting with others (*id.*); moderate limitations in concentrating, persisting, or maintaining pace (R. 21); and moderate limitations in adapting or managing himself. (*Id.*) The ALJ concluded that "[b]ecause the Claimant's mental impairments do not cause at least two 'marked' limitations or one 'extreme' limitation, the 'paragraph B' criteria are not satisfied." (*Id.*) She also found that the paragraph C criteria applicable to Listings 12.04, 12.06, and 12.15 were not satisfied, because "the evidence fails to establish that that there have been changes or increased demands that have led to the exacerbation of symptoms and signs, and deterioration of functioning." (*Id.*)[5]

Before proceeding to step four, the ALJ found plaintiff had the residual functional capacity (RFC) to perform medium work, as defined in 20 C.F.R. § 416.967(c), with the additional non-exertional limitations that he must avoid concentrated exposure to bronchial irritants; could not be exposed to dangerous moving machinery or unprotected heights; and was limited to simple, routine tasks and a "low stress job, defined as requiring no more than occasional decision-making." (R. 21.) In developing plaintiff's RFC, the ALJ gave "little weight" to Dr. Clark's opinion, and expressly rejected her conclusion that plaintiff met the criteria for Listing 12.05(B). (R. 24.) She also rejected, for the most part, the consultative and treating evaluations that supported Dr. Clark's opinion: (1) the portion of the September 1, 2018 evaluation by consultative psychologist Michael Kushner, Ph.D. (R. 724) reporting that plaintiff had a full-scale IQ of 48 as measured by the

---

[4] For the paragraph B criteria generally applicable to mental disorders, *see* 20 C.F.R. Pt. 404, subpt. P, app'x 1, §§ 1200(A), (E), (F). These are the same criteria that are applied in paragraph B(2) of Listing 12.05.

[5] For the paragraph C criteria applicable to Listings 12.04, 12.06, and 12.15, *see* 20 C.F.R. Pt. 404 subpt. P, app'x 1, §§ 1200(A), (G).

Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV), making him "moderately disabled in terms of intellectual functioning" (R. 723); and (2) the portion of the October 17, 2017 Psychiatric Functional Assessment prepared jointly by plaintiff's treating psychologist Tawanna Gilford, Ph.D. and treating psychiatrists Kafilat Ojo, M.D. and Sabish Balan, M.D. (R. 897-902), all at Harlem Hospital Center, opining that plaintiff had mostly marked limitations in understanding, remembering, or applying information (R. 898); mostly marked limitations in interacting with others (R. 899); mostly moderate limitations in concentrating, persisting, or maintaining pace (*id.*); and moderate to marked limitations in adapting or managing himself. (R. 900.) The ALJ also rejected (without express analysis) the opinion of Drs. Gilford, Ojo, and Balan that because of his impairments plaintiff would likely be absent from work more than four days per month and late to work more than four days per month. (*Id.*)

As to plaintiff's IQ, the ALJ did "not accept" Dr. Kushner's conclusion regarding his WAIS-IV scores. (R. 25.) She explained that Dr. Kushner "stated that the results . . . may have been impacted by [plaintiff's] effect [sic] and mood during the examination" and that Dr. Clark also "testified that it was possible that the score could have been skewed." (R. 24.) ALJ Suarez also noted that plaintiff achieved a score of 92 (low average) on an IQ test while in high school, "graduated high school with a Regent's diploma," enrolled in community college (though he "dropped out after one semester"), was "pursuing a career as a concert pianist," and was "well spoken and articulate" at the hearing. (R. 22, 24.)

As to plaintiff's adaptive functioning, the ALJ did "not agree" with his treatment team that he had "any marked limitations in the B criteria." (R. 25.) By way of example, the ALJ noted that plaintiff socialized at the LGBT Center and the GMHC Center. (*Id.*) She also pointed out that his "mental status examinations have been unremarkable," his "daily activities" are "not significantly

5

impacted by his impairments," and "he has been repeatedly noted not to take his medication as prescribed." (*Id*.) In her discussion of plaintiff's RFC, the ALJ also noted that he "was able to work in 2016 and 2017, at a seasonal job." (R. 24.)

On September 24, 2019, the Appeals Council denied plaintiff's request for review of the Decision (R. 2), rendering the ALJ's determination final.

## The Parties' Positions

In his memorandum of law, plaintiff argues the ALJ erred in failing to give controlling weight to the opinion of his treating physicians – Drs. Gilford, Ojo, and Balan – and compounded the error by substituting her own opinion for the expert opinions of Dr. Clark, who testified that plaintiff met Listing 12.05(B), and Dr. Kushner, who administered WAIS-IV test to plaintiff and who concluded that although plaintiff's mood and affect "might have affected some of his scores," the overall results (which included subscores in the 50s, with none higher than 58) were "valid and reliable." (R. 722-23.) *See* Pl. Mem. (Dkt. No. 17) at 15-24. The Commissioner argues that the ALJ's decision is supported by substantial evidence and that she properly assigned little weight to the key opinions of plaintiffs' treating psychologist and psychiatrists. Def. Mem. (Dkt. No. 19) at 14-26. I agree with plaintiff that the ALJ violated the treating physician rule with respect to his functional limitations and that she improperly substituted her own opinion as to his IQ for the opinion of the qualified medical personnel who administered and interpreted the WAIS-IV.

## Standards

In considering the parties' motions, I have reviewed the lengthy administrative record (running to 1140 pages) and applied the familiar and frequently reiterated standards used by federal district courts to review decisions of the Commissioner. Generally speaking, a court may set aside an ALJ's decision only if it is based upon legal error or if the ALJ's factual findings are not

supported by substantial evidence. *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999); *Calvello v. Barnhart*, 2008 WL 4452359, at *8 (S.D.N.Y. Apr. 29, 2008); *Conyers v. Comm'r of Soc. Sec.*, 2019 WL 1122952, at *11-13 (S.D.N.Y. Mar. 12, 2019); *Rivera*, 2020 WL 8167136, at *12-14.

Where, as here, the claim for benefits was initiated prior to March 27, 2017, the court must ensure that the ALJ complied with the treating physician rule, 20 C.F.R. § 416.927(c)(2), which required her to give controlling weight to the opinion of plaintiff's treating physicians so long as those opinions were well supported by medical findings and not inconsistent with other evidence in the record. Put another way: "The ALJ can discount a treating physician's opinion only if the ALJ believes that it 'lack[s] support or [is] internally inconsistent.'" *Ramos v. Comm'r of Soc. Sec.*, 2015 WL 708546, at *15 (S.D.N.Y. Feb. 4, 2015) (quoting *Duncan v. Astrue,* 2011 WL 1748549, at *19 (E.D.N.Y. May 6, 2011)). The treating physician rule is particularly significant "in the context of mental illness," where "a one-time snapshot of a claimant's status may not be indicative of [his] longitudinal mental health." *Estrella v. Berryhill*, 925 F.3d 90, 95-98 (2d Cir. 2019). *Accord Conyers*, 2019 WL 1122952, at *13; *Bodden v. Colvin*, 2015 WL 8757129, at *9 (S.D.N.Y. Dec. 14, 2015); *Ramos*, 2015 WL 708546, at *15.

If the ALJ assigns less than controlling weight to the opinion of a treating physician, she must give "good reasons" for doing so and must "comprehensively set forth [the] reasons for the weight assigned" to the opinion. *Greek v. Colvin*, 802 F.3d 370, 375 (2d Cir. 2015) (quoting *Burgess v. Astrue*, 537 F.3d 117, 129 (2d Cir. 2008)). In particular, the ALJ must "explicitly consider . . . (1) the frequency, length, nature, and extent of treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of the opinion with the remaining medical evidence; and (4) whether the physician is a specialist." *Selian v. Astrue*, 708 F.3d 409, 418 (2d Cir. 2013); *see also* 20 C.F.R. § 416.927(c)(2)(i)-(ii). "[F]ailure to provide good reasons

for not crediting the opinion of a claimant's treating physician is a ground for remand," *Greek*, 802 F.3d at 375; *Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) (per curiam), unless a "searching review of the record" assures the Court that "the substance of the treating physician rule was not traversed." *Estrella*, 925 F.3d at 95-96 (quoting *Halloran*, 362 F.3d at 33).

Remand is also required if the ALJ improperly "substitut[es] [her] own expertise or view of the medical proof for the treating physician's opinion." *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000). More generally, "[t]he ALJ is not permitted to substitute his own expertise or view of the medical proof for the treating physician's opinion *or for any competent medical opinion*." *Greek*, 802 F.3d at 375 (emphasis added). Additionally, the case must be remanded if the ALJ "cherry-picks" evidence to support a particular conclusion. *Estrella*, 925 F.3d at 97; *see also Gomez v. Comm'r of Soc. Sec.*, 2017 WL 1194506, at *17 (S.D.N.Y. Mar. 30, 2017) ("An ALJ may not take a selective view of the record in order to support his conclusion").

### The ALJ Violated the Treating Physician Rule

In concluding that plaintiff "does not have marked limitation in any of the 'B' criteria" (R. 25), ALJ Suarez improperly rejected the opinion of his treating psychologist and psychiatrists, Drs. Gilford, Ojo, and Balan, who jointly concluded that plaintiff had mostly "marked" limitations with respect to two of the four areas of mental functioning evaluated for purposes of plaintiff's mental impairments: understanding, remembering, or applying information, and interacting with others. (R. 898-900.) That opinion – in which Dr. Clark concurred – was well supported by the record, including extensive treatment notes from Harlem Hospital covering approximately 18 months (June 2016-January 2018). (R. 897-951, 1039-1058.) During that period plaintiff graduated from

a "transfer" high school (R. 69),[6] enrolled in community college but failed all of his first semester courses (R. 828, 919-20, 954, 1105-06), got a seasonal job as a "waver," handing out flyers, but was fired "because I was confused on what day to go to work" (R. 70-71), and was evicted from an apartment, forcing him to move back in with an aunt. (R. 831, 838, 843, 849.)

During the same period, plaintiff's mental health fluctuated. As the ALJ noted, his mental status exams were often unremarkable; however, his depression worsened over time (R. 615), and he was repeatedly assessed as "chronically at risk of harm to self/others due to underlying mental illness." (R. 824, 838, 851.) On December 20, 2017 – approximately four months before his first hearing before the ALJ – plaintiff was hospitalized overnight after presenting to the psychiatric emergency room "crying," after an altercation with his aunt, and stating that he "does not want to live anymore." (R. 1007-13.)[7]

Beyond a brief acknowledgement that the report of Drs. Gilford, Ojo, and Balan was "from treating sources" (R. 25), the ALJ failed entirely to discuss the *Burgess* factors. This is a "procedural error," *Estrella*, 925 F.3d at 95-96, that requires remand unless the ALJ has otherwise provided "good reasons" for the less-than controlling weight she assigned to the treating physicians' opinion or a "searching review of the record" assures the Court that "the substance of the treating physician rule was not traversed." *Id*. (quoting *Halloran*, 362 F.3d at 32). In this case, neither the Decision nor the underlying record provides that assurance.

---

[6] As plaintiff explained at the April 11, 2018 hearing, he graduated (at age 19) from James Baldwin High School in New York City, which is a "transfer" school. (R. 69.) Transfer schools serve students "who have dropped out or fallen behind in credits." *See* New York City Dep't of Education, "Transfer High Schools," https://www.schools.nyc.gov/enrollment/other-ways-to-graduate/transfer-high-schools (last visited Oct. 18, 2021). Although plaintiff testified that he received a Regents diploma (R. 69), he also testified that he failed the Regents exams. (*Id.*)

[7] Plaintiff received emergency treatment for suicidality on at least one prior occasion, after an altercation with his father (R. 456-76) and frequently self-reported earlier suicide attempts. (*E.g.*, R. 22, 87-88, 96, 587, 808, 821, 828, 838, 842, 848, 850, 854, 897, 910, 960.)

As noted above, the ALJ gave four reasons for her conclusion that plaintiff had no "marked" limitations: his socializing at the LGBT Center and the GMHC Center; his unremarkable mental status exams; his "daily activities"; and his medication noncompliance. (R 25.) Plaintiff did testify that he attended social events at the LGBT Center and the GMHC Center. He also testified, without contradiction, that although he "tried to make friends" there, "it never really seems to work." (R. 67.) Plaintiff's treatment notes similarly reflect "difficulty with friendships" (R. 592) and "chronic social isolation" (R. 703), as well as frequent altercations with family (R. 456, 462, 590, 598, 615, 704, 823, 828, 1017) and difficulty with anger and mood instability. (R. 587, 590, 615, 703, 823, 1033-34.) By noting plaintiff's attendance at social events without discussing his lack of social success (there or elsewhere), family altercations, and anger issues, the ALJ improperly "cherry-picked" the evidence, *Estrella*, 925 F.3d at 97, in a case where "the record as a whole suggested greater dysfunction." *Gough v. Saul*, 799 F. App'x 12, 14 (2d Cir. 2020) (summary order).

Similarly, the ALJ erred when she relied on plaintiff's frequently unremarkable mental status exams to discount the conclusions of his treating psychologist and psychiatrists – without mentioning his December 2017 hospitalization for suicidality. "A mental health patient may have good days and bad days [and] may respond to different stressors that are not always active." *Bodden*, 2015 WL 8757129, at *9; *accord Ramos*, 2015 WL 708546, at *15. That is why the longitudinal understanding of a claimant's impairment provided by his treating physicians is "particularly important" with respect to mental health conditions. *Bodden*, 2015 WL 8757129, at *9 (collecting cases).

Plaintiff's ability to perform daily activities such as bathing, dressing, and taking public transportation (R. 24-25) also says little, if anything, about his ability to understand, remember, or

10

apply information, his ability to interact with others, or – more generally – his ability to hold down a full-time job. "[T]here is nothing inherent in these activities that proves Plaintiff has the ability to perform '[t]he basic mental demands of competitive, remunerative, unskilled work,'" much less "to do so '8 hours a day, for 5 days a week, or an equivalent work schedule[.]'" *Harris v. Colvin*, 149 F. Supp. 3d 435, 445 (W.D.N.Y. 2016) (quoting SSR 85-15, SSR 96-8p); *see also Rodriguez v. Berryhill*, 2017 WL 5133342, at *4 (W.D.N.Y. Nov. 6, 2017) (where a plaintiff is "not claiming significant physical limitation," his ability to "care for his mother, perform daily hygiene and self-care, cook and wash clothes, mow the lawn, and shovel snow has no bearing on the mental portion of the RFC assessment that is at issue here"); *Mejia v. Barnhart*, 261 F. Supp. 2d 142, 147-48 (E.D.N.Y. 2003) (rejecting ALJ's finding that "plaintiff's ability to watch TV, play solitaire, go to church, and engage in basic household and self-care with the assistance of her family" were "inconsistent" with her claim of "a disabling mental impairment"); 20 C.F.R. pt. 404, subpt. P, app'x 1 § 1200(H)(3)(d)-(e) (neither "the fact that [the claimant] engage[s] in common everyday activities, such as caring for [his] personal needs," nor "the fact that [he has] engaged in work activity" will necessarily mean that the claimant does not have the required deficits in adaptive functioning required by paragraph B(2) of Listing 12.05).

Finally, while the ALJ correctly stated that plaintiff was frequently noncompliant with his medication regime (R. 791, 803, 823), she failed to note that, in the eyes of Drs. Gilford, Ojo, and Balan, this was an example of his "difficulty following through" and thus *supported* their view that he had marked limitations in understanding, remembering, and applying information. (R. 898.) *See also Sweet v. Astrue*, 32 F. Supp. 3d 303, 314 (N.D.N.Y. 2012) ("Faulting a person with a diagnosed mental illness for failing to pursue mental health treatment is a 'questionable practice.'" (quoting *Day v. Astrue,* 2008 WL 63285, at *5 n.7 (E.D.N.Y. Jan.

11

3, 2008))). I therefore conclude that the ALJ failed to provide "good reasons" for not crediting the well-supported opinion of plaintiff's treating psychologist and psychiatrists (in which Dr. Clark concurred) as to his functional limitations, requiring remand. *Estrella*, 925 F.3d at 95-96 *Greek*, 802 F.3d at 375; *Halloran*, 362 F.3d at 33.

The ALJ also erred in ignoring (and thereby rejecting *sub silentio*) the opinion of Drs. Gilford, Ojo, and Balan that due to his mental impairments he would likely be absent from work more than four days a month, which significantly exceeds the maximum of "[o]ne day a month" that – according to VE Belchick – would be tolerated by an employer. (R. 1130.) *See Augustin-Smith v. Saul*, 2020 WL 9816019, at *11 (E.D.N.Y. Nov. 30, 2020) (remanding where, among other things, "the ALJ failed to discuss uncontradicted parts of Dr. Michael's opinion, such as Dr. Michael's conclusion that Plaintiff is likely to be absent from work as a result of her impairment or treatment for four or more days per month."); *Benitez v. Comm'r of Soc. Sec.*, 2021 WL 4239244, at *15 (S.D.N.Y. Sept. 17, 2021) (remanding where ALJ failed to give good reasons for rejecting opinion of plaintiff's treating psychiatrists that her mental health symptoms "would cause her to miss work more than three times per month"); *Dorsey v. Saul*, 2020 WL 1307107, at *9 (D. Conn. Mar. 19, 2020) (remanding where "the ALJ did not incorporate Dr. Graham's opinion that Plaintiff would be chronically absent, more than twice per month").

### The ALJ Improperly Relied on her Own Opinion as to Plaintiff's IQ

Plaintiff's full-scale IQ of 48 on the WAIS-IV easily satisfies paragraph B(1) of Listing 12.05, for which the cutoff score is 70. According to Dr. Kushner, who administered the test, the results were "valid and reliable," notwithstanding that plaintiff's "affect and mood during the test evaluation might have affected some of his scores." (R. 722.) Thus, Dr. Kushner diagnosed "moderate intellectual disability" as well as depression, PTSD, ADHD, and anxiety. (R. 724.) Dr.

Clark agreed. After reviewing the entire medical record (including plaintiff's prior IQ testing), the ME testified that although the full-scale score of 48 "may be artificially depressed just a little bit" because of plaintiff's depression, PTSD, ADHD and anxiety, the subscores were consistent, all "clustered around the fifties," leading to the conclusion that plaintiff has "a severe learning disability" and "can't function in the . . . average world." (R. 99-100.)

The ALJ improperly rejected both the "valid and reliable" results of the WAIS-IV (that is, that plaintiff's full-scale IQ was 48) and Dr. Clark's opinion that plaintiff met the IQ score criteria for Listing 12.05 (that is, that his full-scale IQ was below 70), based largely on the *possibility* that "the score could have been skewed," her own lay observation that plaintiff was "well spoken and articulate," and a selectively curated description of his educational and employment history. (R. 24-25.)[8] This too was error, because ALJ Suarez is not a psychiatrist or a psychologist and did not have the expertise to determine plaintiff's IQ. *See Shaw v. Chater*, 221 F.3d at 134; *Greek*, 802 F.3d at 375; *Rivera*, 2020 WL 8167136, at *21 (remanding where ALJ improperly "use[d] the administrative hearing" to "make his own 'lay assessment' of the claimant's general mental functioning, which amounts to 'a variant of the disfavored sit and squirm test'" (quoting *Harris v. Colvin*, 149 F. Supp. 3d 435, 446 (W.D.N.Y. 2016))); *Bradley v. Berryhill*, 2017 WL 3314000, at *7 (D. Conn. Aug. 3, 2017) (where the claimed impairments were mental rather than physical, and were "triggered in some situations but not others," the ALJ "erred by giving the plaintiff's

---

[8] The ALJ noted that plaintiff graduated from high school (R. 24), but did not mention that he failed his high school Regents exams. (R. 69.) She stated that he "dropped out" of community college (R. 24), but omitted that he failed all of his courses in his first semester. (R. 828, 919-20, 954, 1105-06.) She also omitted that he was fired from the only job he ever held because he was "confused on what day to go to work." (R. 70-71.) As for plaintiff's "career as a concert pianist" (R. 22), the record reflects only that plaintiff repeatedly expressed the wish to become a concert pianist (or a music teacher). (*E.g.*, R. 588, 861.) There was no evidence before the ALJ suggesting that plaintiff was taking concrete steps to pursue such a career.

demeanor [at the hearing] any weight at all"). If the ALJ believed that Dr. Kushner's results were questionable, she could have scheduled plaintiff for another consultative examination and/or further testing. But she was not at liberty to substitute her own view of plaintiff's intellectual capacity for that of the professionals who formally assessed him.

## Conclusion

Because the ALJ violated the treating physician rule and improperly substituted her own lay opinion as to plaintiff's IQ for that of the medical professionals who administered the WAIS-IV and interpreted its results, plaintiff's motion (Dkt. No. 16) is GRANTED, the Commissioner's motion (Dkt. No. 18) is DENIED, and this action is REMANDED for further proceedings.

On remand, should the ALJ once again reject or discount the opinions of plaintiff's treating physicians, she should "comprehensively" set forth the reasons for the weight assigned to those opinions and explicitly consider the factors set forth in 20 C.F.R. § 416.927(c)(2)(i)-(ii). Should she once again reject or discount the results of plaintiff's most recent IQ testing, she should explain her reasoning with reference to competing test results or qualified medical opinions, rather than rely on her own lay observations or interpretation of the non-medical evidence. In addition, the ALJ should consider Listing 12.05 at step three and – in the event she determines that plaintiff's impairments do not meet or medically equal any relevant listing – reconsider her formulation of his RFC. The Clerk of Court is respectfully directed to close the case.

Dated: New York, New York
October 18, 2021

**SO ORDERED.**

_____
**BARBARA MOSES**
**United States Magistrate Judge**